Terri Lee HALDERMAN et al., Plaintiffs,

v.

**PENNHURST STATE SCHOOL AND HOSPITAL et al., Defendants,**

**United States of America, Plaintiff-Intervenor,**

**Pennsylvania Association for Retarded Citizens et al., Plaintiffs-Intervenors.**

Civ. A. No. 74–1345.

United States District Court, E. D. Pennsylvania.

Nov. 18, 1981.

David Ferleger, Philadelphia, Pa., for Terri Lee Halderman.

Thomas M. Kittredge, Philadelphia, Pa., for Bucks, Chester and Delaware Counties.

Robert B. Hoffman, Deputy Atty. Gen., Harrisburg, Pa., for the Commonwealth of Pennsylvania.

Thomas Gilhool, Philadelphia, Pa., for Pennsylvania Association for Retarded Citizens.

Herbert B. Newberg, Philadelphia, Pa., for David Ferleger, Esq.

Pamela P. Cohen, Philadelphia, Pa., for Pennhurst Parents Association.

Adjoa A. Burrow, Civ. Rights Div., Dept. of Justice, Washington, D. C., R. Stephen Barrett, Asst. County Sol., Norristown, Pa., for Montgomery County.

Marc H. Myers, Asst. City Sol., Philadelphia, Pa., for Philadelphia County.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

In March 1981, the Honorable Helen O'Bannon, Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania, made public allegations that the Special Master appointed by this Court was duplicating services being performed by the Commonwealth and County defendants in this litigation. Since it was never the Court's intention that the Special Master's Office should duplicate any services being performed by the defendants, the Court entered an Order (Order of August 26, 1981) that a hearing be held for the purpose of determining what, if any, services being performed by the defendants are or were duplicating work being performed by the Special Master. On October 19, 1981, that hearing took place. Based on the evidence produced at the hearing, for the reasons set forth herein, the Court finds that the Special Master is not now duplicating and has not in the past duplicated services performed by any defendant.

### The History of the Litigation

As is now well-known to the litigants, this Court, in an opinion filed December 23, 1977, 446 F.Supp. 1295, made findings of fact and conclusions of law holding that defendants were violating the constitutional and statutory rights of the residents of Pennhurst, as well as the other members of the plaintiff class (hereinafter referred to as the Pennhurst residents), by failing to provide them with minimally adequate habilitation in the least restrictive environment. As the trial record in this case reveals, all parties to this litigation admitted that the residents of Pennhurst were not receiving minimally adequate habilitation. The Court found that Pennhurst as an institution was inappropriate and inadequate to habilitate its retarded residents. At trial, the Commonwealth represented that it intended to close Pennhurst in the early 1980's. This it has not done.

On January 6, 1978, this Court held a hearing to determine the injunctive order necessary to remedy the Constitutional and statutory violations. The parties were asked to attempt to agree on the terms of the Court's Order, but no agreement was forthcoming. On March 17, 1978, the Court issued an injunction which, among other things, created the Office of the Special Master. The Special Master was appointed to monitor defendants' planning for and the providing of community living arrangements and services in addition to monitoring living conditions at Pennhurst, as well as in the community facilities to which Pennhurst residents would be transferred. The Commonwealth defendants, when not faced with contempt proceedings during a two and a-half year period from the entry of this Court's Order on March 17, 1978 446 F.Supp. 1295 at 1326, through the end of August, 1980, transferred only 122 of approximately 1,200 Pennhurst residents to community living arrangements. The Commonwealth defendants' failure to comply diligently with this Court's Orders during that period has underscored the need for a Special Master.

On December 13, 1979, the Court of Appeals approved this Court's appointment of the Special Master, and its "determination

that, for the retarded class members as a whole, Pennhurst cannot be an appropriate setting in which to provide habilitation." (612 F.2d at 114).

This Court's Orders provide that the Special Master shall be compensated by the Commonwealth defendants (Orders of March 17, 1978; April 24, 1980; and June 10, 1980). The funds required for the operation of the Office of the Special Master are costs of litigation under Federal Rules of Civil Procedure 53 and 54 and were assessed against the Commonwealth defendants as losing parties in this litigation. The Commonwealth defendants did not appeal these Orders. They complied with these Orders and paid the Masters' costs during fiscal years 1978–79, 1979–80 and 1980–81. Funds for those payments were included in the Commonwealth's budget for Pennhurst. In fiscal year 1981–82, however, the Department of Public Welfare and Secretary Helen O'Bannon took steps which this Court found to have been designed to thwart the Court's Orders mandating funding for the Masters' offices. The Court found the Department and Secretary O'Bannon in contempt of court and imposed a compensatory, coercive civil contempt fine upon the Commonwealth for each day that the Masters' offices remained unfunded after September 2, 1981 (Order of August 25, 1981).

On September 3, 1981, United States Supreme Court Justice William J. Brennan, acting as Circuit Justice for the Third Circuit, issued a temporary stay of this Court's contempt Order pending full review of the Commonwealth's application for a permanent stay pending appeal to the Third Circuit. The Third Circuit had already denied a stay. On September 17, 1981, Circuit Justice Brennan denied the application for a stay and vacated his temporary stay Order. The Commonwealth defendants, pursuant to Supreme Court rules, resubmitted the matter to Justice Rehnquist, who referred the application to the full Court, which denied the application for a stay on October 5, 1981, —— U.S. ——, 102 S.Ct. 82, 70 L.Ed.2d 78.

As of this date, $490,000 in civil contempt fines has been paid into the Registry of the Court by the Commonwealth defendants. On October 20, 1981, the Court transferred $87,314 of these funds to the Special Master for the purpose of resuming the full-scale operation of the Master's office. On October 21, 1981, the Special Master resumed full-scale operation. Currently, the Special Master submits weekly proposed expenditures to the Court which the Court must approve before the Master disburses the sums transferred from the Registry of the Court.

*The Function of the Special Master*

From its inception, the Office of the Special Master was charged with the primary task of monitoring the defendants' compliance with the injunctive relief ordered by the Court. All the activities of the Special Master were necessitated by this mandate.

The Court's original relief order (Order of March 17, 1978, 446 F.Supp. 1295 at 1326), and subsequent relief orders (see, e. g., Order of March 5, 1979) have specifically directed the defendants to provide the relief to which this Court found the plaintiff Pennhurst residents entitled to receive under the Constitution of the United States, as well as state and federal statutes. The Special Master was appointed with "the power and duty to plan, organize, direct, supervise and monitor the implementation of . . . Orders of the Court." (Orders of March 17, 1978 and April 24, 1980). This grant of authority is specifically limited to the Orders of the Court and was never intended as authorizing the Special Master to operate Pennhurst or any community living arrangement.

One primary task of the Special Master is to regularly monitor the community living arrangements to which Pennhurst residents are being transferred. This function of the Special Master is essential for the purpose of assuring that the Pennhurst residents are transferred to community facilities that are safe, sanitary, and beneficial to their habilitation. The Court has always been vitally concerned that no Pennhurst resident or any member of the plaintiff class be transferred to any community facility that is not beneficial to his or her habilitation. In particular, it is the function of the Spe-

cial Master to make certain that the poor sanitation, the dangers to life and limb, and the lack of training programs which this Court found to exist at Pennhurst are not duplicated on a smaller scale in community living arrangements. This function of the Special Master is particularly necessary in that the Commonwealth defendants have been operating without rules, regulations or policies designed to make certain that the community living arrangements for the retarded are safe and sanitary, and that the programs and services necessary for habilitation are being provided.

Another primary function of the Special Master is to review individual habilitation plans for each retarded member of the class in order to ensure that the plan for each of the retarded residents provides for such care and services as will enable them to cope with life as effectively as their capacities will permit. This function of the Special Master is essential in light of the Court's finding that individual habilitation plans had not been prepared for the Pennhurst residents. The orders of this Court require the defendants to provide an individual habilitation plan for each retarded resident of Pennhurst in order to make certain that each receives such care and services as will be beneficial to his or her habilitation.

The third primary function of the Special Master is to monitor conditions at Pennhurst. This monitoring function is essential in order to make certain that the abuses this Court found to exist at Pennhurst were corrected. Among the abuses which the Court found to exist were: (a) punishment of the residents by solitary confinement; (b) unregulated use of physical restraints; (c) use of superfluous and dangerous drugs; (d) the administration of drugs for staff convenience; (e) inadequate programs for habilitation; (f) force-feeding of residents in supine positions; (g) unsanitary living conditions; (h) exposing residents to unnecessary dangers. As this Court found in 1977, the retarded living at Pennhurst had regressed rather than progressed in their abilities to perform the basic functions required for daily living. 446 F.Supp. at 1308.

The monitoring function of the Special Master in connection with conditions at Pennhurst has never been considered by this Court or the Special Master as authorizing the Special Master to "run" Pennhurst.

The injunctive relief ordered by this Court (Order and Memorandum of March 17, 1978; Order of March 5, 1979) as modified in light of the Third Circuit's decision (612 F.2d 84) (Order and Memorandum of April 24, 1980) requires that individual habilitation plans be developed for each resident of Pennhurst and other retarded members of the plaintiff class. These proposals are developed by a Planning and Assessment Team (PAT) which includes but is not limited to the Pennhurst resident, the case manager, and the parent, guardian or certified advocate of the Pennhurst resident. Frequently joining this team are the day program and residential program providers for the retarded client as well as medical and habilitation specialists. The Special Master's role in the development of the individual habilitation plan is limited to monitoring in order to make certain that a plan has been formulated in accordance with professional standards for each Pennhurst resident in order that each of them will have a reasonable opportunity to acquire and maintain such life skills as are necessary to enable him or her to cope as effectively as his or her capacities permit. The Special Master does not determine which Pennhurst residents will be moved to the community, when they will move, or where they will move. Such decisions are the responsibility of the defendants pursuant to this Court's Orders.

The Third Circuit approved the Court's appointment of the Special Master, stating

In this case ... the court's resort to use of a master is particularly appropriate. After the decision on liability was announced, the appellants were afforded an opportunity to devise and present their own remedies for conditions at Pennhurst. They failed to do so. At that point, having received insufficient

assistance from the officials directly involved, the court was faced with the choice of massive personal participation in devising a complex scheme for remedying the violations that were found or proceeding with the assistance of a master, whose functions would be supplementary to and supervisory over those of the Commonwealth and County defendants. We hold that the trial court chose correctly in ordering the appointment of a master. 612 F.2d at 112.

It was never the intention of the Court that the Special Master should perform the responsibilities of the defendants under the Court's Orders. The Special Master's function is to monitor for the purpose of determining whether the defendants are complying with this Court's Orders. Although the Court's Orders required the defendants to initiate, carry out and plan for the transfer of the retarded residents of Pennhurst to community facilities, as this Court found in its Memorandum of March 2, 1981:

> In March, 1978, when the Court issued its initial remedial Order, the population of Pennhurst was 1,156. Despite this Court's Orders, and despite the representations by the defendants of their intentions to comply with this Court's Orders, the retarded population of Pennhurst had been reduced by only 184, to a total of 972, as of the end of August, 1980—and not all of that reduction was due to community placements. The school-age residents of Pennhurst, the subject of two specific Court Orders, had not all been placed in the community by the extended deadline of June 30, 1980, and indeed have not all been transferred even as of the present date.... Furthermore, as heretofore pointed out, so far in this fiscal year which ends on June 30, 1981, the defendants have provided only 4 community living arrangements in the Southeast Region for the retarded residents (not covered by the School-Age Order issued by this Court) and only 17 community living arrangements for other retarded persons in the Southeast Region. These numbers standing alone reflect an attitude of indifference to the rights of the retarded. (Memorandum of March 2, 1981 at 5–6).

This finding made it obvious that the defendants were not acting diligently with a steadfast purpose to comply with this Court's Orders. On March 2, 1981, the Court specifically ordered:

> 1. Defendants shall provide community living arrangements together with all the services required by the retarded person's Individual Habilitation Plan for at least 61 Pennhurst residents (not covered by the School-Age Order)—8 from Bucks County, 11 from Chester County, 9 from Delaware County, 15 from Montgomery County, and 18 from Philadelphia County—and for at least 29 other retarded persons in the Southeast Region of Pennsylvania including members of the plaintiff class during the period commencing with the date of this Order and closing June 30, 1981.

The Court's Order of March 2, 1981 makes it abundantly clear that the obligation to plan for, initiate, and transfer Pennhurst residents to the community rests with the defendants, not with the Office of the Special Master.

In hearings held in July, 1981, for the purpose of determining whether the defendants were in contempt of that order, the Court found that, after the contempt citation was issued, the defendants substantially complied with the Order of March 2. The Court found further that all of the transfers of the Pennhurst residents to community living arrangements were accomplished by the defendants with great concern for the beneficial habilitation of the retarded persons. As this Court has often stated, no Pennhurst resident should be moved into the community unless and until an appropriate living arrangement has been made available with all the necessary services required in accordance with the resident's individual habilitation plan. The transfers from Pennhurst to date have in the main provided each of the retarded residents of Pennhurst such minimally adequate habilitation as will give them the opportunity to acquire and maintain such

life skills as are necessary for them to cope with life as effectively as their capacities will permit. Although a few of the retarded residents of Pennhurst and their families have demonstrated a reluctance to leave the institution, the overwhelming majority now enjoy the freedom to begin a life that offers the assurance of better living.

In sum, the Court's Orders to date have enjoined the defendants to plan for, transfer, and provide Pennhurst residents with appropriate living arrangements in the community. These Orders clearly show that the duty to comply with this Court's Order rests with the defendants. The role of the Special Master is limited to monitoring the defendants' compliance. In view of this specific delineation of functions, the Court wished to make certain that the Special Master and the Commonwealth defendants were not duplicating services, as was alleged by the Department in its 1981–82 Budget Briefing Book, as well as in the Secretary's testimony before the state legislature. Therefore, the Court issued the following Order:

AND NOW, this 26th day of August, 1981, whereas the Honorable Helen O'Bannon, Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania, has made public allegations that the Special Master appointed by this Court is duplicating the functions of the Commonwealth and County defendants in this litigation, it is hereby ORDERED that a hearing shall be held on Thursday, October 15, 1981 at 2:00 P.M. in Courtroom 10–B of this United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania, for the purpose of determining what, if any, services being performed by the Special Master are duplicating work being performed by any defendant.

On the basis of the evidence presented at this hearing, the Court finds that there has been no duplication of services. No evidence was presented at this hearing that the Special Master has ever managed or attempted to manage Pennhurst, any community living arrangement, or any program of the defendants. The evidence clearly shows that the Special Master has steadily urged all the defendants to comply with this Court's Orders and has regularly kept this Court advised concerning both compliance and non-compliance. The Court does find, however, on the basis of the evidence presented at the hearing, that the Commonwealth defendants are planning to assume a more active role in carrying out their responsibilities under the Court's Orders. When these plans of the Commonwealth become operative, the Court envisions that the monitoring functions of the Special Master will be lightened considerably.

The Commonwealth defendants' allegations of duplication were apparently based on their misconception of the duties of the Special Master. They appear to have been laboring under the misconceived notion that the Master's Office had been designed to supplant their responsibility for inspecting the community living facilities provided by them, reviewing individual habilitation plans, and making certain that the counties were carrying out the responsibilities required of them under state law. The Commonwealth defendants appear to take the position that they should be able to monitor their own compliance with the Court's Orders. This would be somewhat akin to requesting the fox to guard the henhouse. Unfortunately, as heretofore pointed out, the performance of the defendants in this case underscores the need for the Special Master.

It has never been the Court's intention that the Office of the Special Master become a permanent and continuous operation. This Court will not be reluctant to reduce the staff of the Special Master's Office whenever it is convinced that the Commonwealth and County defendants are moving with due diligence to effectuate the Court's Orders. As of the October 19th hearing, 870 people remained at Pennhurst. Whenever the Commonwealth and County defendants have provided living arrangements in the community for all Pennhurst residents, this Court would probably have no reason to continue the monitoring func-

tions of the Special Master. Unfortunately, as the record in this case reveals, the defendants have not been diligently carrying out their responsibilities to the Pennhurst residents as required by this Court's Orders. Compliance with this Court's Orders requires a monitor who is not subject to the jurisdiction and control of the defendants.

Although the resident population currently at Pennhurst indicates that the defendants have not accomplished as much as they should have under this Court's Orders, the Court is nevertheless encouraged by the fact that all the studies thus far submitted to this Court convincingly show that the Pennhurst residents who have been placed in appropriate community living arrangements are, as each day passes, improving in habilitative skills. *See* C. Feinstein, J. Lemanowicz, J. Conroy, "Progress of Clients in Community Living Arrangements: Class Members Compared to Others" (Exhibit P–23) 5 (September 19, 1981). Their habilitation in community living arrangements is in stark contrast to the finding in this record that an overwhelming number of the retarded at Pennhurst experienced a regression in life skills while at the institution. 446 F.Supp. at 1308.

### ORDER

AND NOW, this 18th day of November, 1981, for the reasons set forth in this Court's Memorandum of November 18, 1981,

IT IS HEREBY ORDERED: the Special Master shall continue to monitor the compliance of the defendants with this Court's Orders;

IT IS FURTHER ORDERED: the Special Master shall submit to this Court, on or before December 2, 1981, a budget for the operation of the Office of the Special Master for the period commencing January 1, 1982, which budget shall provide for substantial reductions in the costs of operating the Special Master's Office predicated upon the Commonwealth defendants carrying out their plan to implement their obligations to review the individual habilitation plans of plaintiff class members and periodically in-

spect the community living arrangements to which plaintiff class members have been and will be transferred.