**Terri Lee HALDERMAN, et al.**

v.

**PENNHURST STATE SCHOOL AND HOSPITAL, et al.**

Civ. A. No. 74–1345.

United States District Court, E. D. Pennsylvania.

Aug. 12, 1982.

David Ferleger, Philadelphia, Pa., for Terri Lee Halderman.

Thomas M. Kittredge, Philadelphia, Pa., for Bucks, Chester and Delaware Counties.

Robert B. Hoffman, Deputy Atty. Gen., Harrisburg, Pa., for the Com. of Pa.

Thomas Gilhool, Philadelphia, Pa., for Pennsylvania Ass'n for Retarded Citizens.

Herbert B. Newberg, Philadelphia, Pa., for David Ferleger, Esq.

Pamela P. Cohen, Philadelphia, Pa., for Pennhurst Parents Ass'n.

Terissa Chaw, Civ. Rights Div., Dept. of Justice, Washington, D. C., R. Stephen Barrett, Asst. County Sol., Norristown, Pa., for Montgomery County.

Marc H. Myers, Asst. City Sol., Philadelphia, Pa., for Philadelphia County.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

The Court's original injunctive Order in this case (Order of March 17, 1978, 446 F.Supp. 1295, 1326) as modified by the order of April 24, 1980, appointed a Special Master to aid in implementing the injunctive relief by submitting plans for procedures to protect the rights of the plaintiff class and to monitor the defendants' compliance with this Court's Orders. The Office of the Special Master has performed these tasks exceptionally well, especially in view of the many instances of non-compliance on the part of the defendant (see, e.g., pp. 416–17, infra). The Court has determined, however, that the time is approaching when the Office of the Special Master should no longer be required in order to ensure protection for the retarded residents of Pennhurst. For the reasons hereinafter set forth, the Court will therefore enter an order directing that the Office of the Special Master plan to phase out its operations and terminate its activities by December 31, 1982.

*History of the Litigation*

As is well-known to the litigants, this case began in 1974 as a class action in which the named plaintiffs, retarded persons (the "Pennhurst class") who were either residents of Pennhurst State School and Hospital ("Pennhurst") or on the waiting list for residence at Pennhurst as of May 30, 1974, claimed injury based on violations of certain state and federal statutes and the United States Constitution in connection with their institutionalization at Pennhurst. This Court, in its findings of fact and conclusions of law (Memorandum of December 23, 1977, 446 F.Supp. 1295) found that the defendants were violating the constitutional and statutory rights of the Pennhurst Class by failing to provide them with minimally adequate habilitation in the least restrictive environment. This holding has been affirmed on two occasions by the United States Court of Appeals for the Third Circuit, sitting en banc. The legal bases for its affirmances were predicated upon federal and state statutes, and the constitutional violations found by this Court have not as yet been directly addressed by either the Third Circuit or the United States Supreme Court. See pp. 414–15, infra.

On January 6, 1978, this Court held a hearing to determine the injunctive relief necessary to remedy the violations. The parties were asked to attempt to agree on the terms of the Court's order, but no agreement was forthcoming. On March 17, 1978, the Court issued an injunctive Order setting forth the relief to which the retarded residents of Pennhurst were entitled (446 F.Supp. at 1326). The March 17, 1978 Order, inter alia, established the Office of the Special Master. At that time, the Special Master was, for a variety of reasons, essential to monitoring the relief which would ensure that the Pennhurst residents would receive the minimally adequate habilitation which the Court found had been denied them. At the time the Special Master was appointed by the Court, it was the understanding of the parties as well as the Court that this would be a short-term appointment in that it was contemplated that community living arrangements could be provided for the Pennhurst residents within a few years. It was never envisioned that the Special Master would be necessary for as long as has been the case. See p. 416, infra. However, for the reasons hereinafter set forth, the Court at long last finds that the Office of the Special Master will no longer be necessary for the effective implementation of the injunctive relief

which this Court has ordered for the plaintiff class.

This case, which began in 1974, was tried before the Court, sitting without a jury, over a period of 32 days, ending June 13, 1977. At the trial, all the parties, including the defendants, agreed with the testimony of many experts who testified that Pennhurst was inappropriate and inadequate for habilitation of its mentally retarded residents and that the retarded at Pennhurst were not receiving minimally adequate education, training and care. The defendants did not dispute this finding, but insisted that they wished to accomplish the minimally adequate habilitation by placing the Pennhurst residents in community facilities pursuant to their own schedule, which the Court found to be vague and indefinite.

The Court found, and the defendants admitted, that Pennhurst, in 1977, did not "meet the minimum standards for the habilitation of its residents." (446 F.Supp. at 1302). The Court also found that Pennhurst was overcrowded and understaffed and without the programs which the experts considered necessary for minimally adequate habilitation. The evidence showed that a large number of Pennhurst residents had actually showed a regression of basic living skills as a result of their confinement at Pennhurst. All parties to the litigation agreed that Pennhurst as an institution was inappropriate and inadequate for the habilitation of the retarded. (446 F.Supp. at 1304). Programming and training of the retarded Pennhurst residents was found to fall far short of the minimum required for adequate habilitation according to the uncontradicted expert testimony of habilitation professionals. (446 F.Supp. at 1304). Not only was the habilitation then inadequate, but Pennhurst had no plans for improving the programming available to its residents. (446 F.Supp. at 1305). ·

Furthermore, the evidence presented at trial clearly showed that Pennhurst residents were not only receiving inadequate habilitation but also were regularly subjected to a number of dehumanizing practices.

Specifically, this Court found that at Pennhurst restraints were used as control measures in lieu of adequate staffing. (446 F.Supp. at 1306). The Court further found that psychotropic drugs at Pennhurst were used for control and not for treatment, and the rate of drug use on some of the units at Pennhurst was extraordinarily high. (446 F.Supp. at 1307). Regarding treatment at Pennhurst, the Court found that the environment at Pennhurst was not only not conducive to learning new skills, but it was so poor that it contributed to the loss of skills already learned. (446 F.Supp. at 1308). One survey showed that more than one-third of the Pennhurst residents had "some notation of regression in their records." (446 F.Supp. at 1308, n.40). Pennhurst, at the time of trial, was in fact a dangerous place to live. "Injuries to residents by other residents and through self-abuse, were common.... In addition, there [was] some staff abuse of residents." (446 F.Supp. at 1308–09). The Court also found that many of the residents suffered physical deterioration and intellectual and behavioral regression during their residency at Pennhurst. (446 F.Supp. at 1309).

Based upon the uncontradicted evidence presented at trial, the Court found that

Since the Early 1960's there has been a distinct humanistic renaissance, replete with the acceptance of the theory of normalization for the habilitation of the retarded. Mason & Menolascino, *supra* note 6, at 136. [*The Right to Treatment for Mentally Retarded Citizens: An Evolving Legal and Scientific Interface*, 10 Creighton L.Rev. 124 (1976)]. The principles of normalization are an outgrowth of studies showing that those in large institutions suffered from apathy, stunted growth and loss in I.Q., and that the smaller the living unit on which the retarded individual lived, the higher the level of behavioral functioning shown by the individual. (Roos, N.T. 1–96 to 1–104). Under the principles of normalization, the retarded individual is treated as much like the non-retarded person as possible. (*Id.*, N.T. 1–106, 1–107). The basic

tenet of normalization is that a person responds according to the way he or she is treated. (Glenn, N.T. 5–186, 5–187). The thrust of habilitation through normalization is the remediation of the delayed learning process, so as to develop the maximum growth potential by the acquisition of self-help, language, personal, social, educational, vocational and recreation skills. Mason & Menolascino, supra note 6, at 139–140. The older theories of habilitating the retarded stressed protecting the individual, and were characterized by little expectation of growth. Given this lack of expectation, the individual rarely exhibited growth. However, once removed from depressing, restrictive routines, the retarded have been able to accomplish a great deal. (Dybwad, N.T. 7–160).

The environment at Pennhurst is not conducive to normalization. It does not reflect society. It is separate and isolated from society and represents group rather than family living. (Hirst, N.T. 7–124). The principles of normalization have been accepted by the administration of Pennhurst and by the Department of Public Welfare, which is responsible for the administration of programs for the retarded in the five county area (Youngberg, N.T. 22–171; Rice, N.T. 26–43 to 26–45; Bilyew, N.T. 24–13; Hirst, N.T. 7–120), and the current intention of the Department of Public Welfare is to transfer all residents from Pennhurst by the early 1980's. (Rice, N.T. 28–48).

The five county area (Bucks, Chester, Delaware, Montgomery and Philadelphia) has some community facilities providing for the education, training and care of the retarded covering all ages of retardation, including the profoundly retarded with multiple handicaps. (Girardeau, N.T. 4–140, 4–141). These community facilities have been an outgrowth of the acceptance of the principle of normalization and the rejection of institutions such as Pennhurst in connection with the habilitation of the retarded.

Many individuals now living at Pennhurst could be moved immediately into the community and would be able to cope with little or no supervision. (Settle, N.T. 6–126; Hirst, N.T. 7–116). All the parties in this litigation are in agreement that given appropriate community facilities, all the residents at Pennhurst, even the most profoundly retarded with multiple handicaps, should be living in the community. (Dybwad, N.T. 7–68).

The primary limiting factor in the transfer of Pennhurst residents to community facilities has been the failure of the Commonwealth and its subdivisions to provide sufficient living units, vocational and day care facilities and other support services at the community level. Since fiscal year 1972, only 186 Pennhurst residents have been transferred from the institution directly into community living units. (Bilyew, N.T. 24–50); although 176 others were transferred from Pennhurst to other institutions during 1974 and 1975. (Clark, N.T. 21–170).

In November, 1970, Act 256 was signed by the Governor of Pennsylvania. This legislation appropriated twenty-one million dollars for the purpose of planning, designing and constructing community facilities which would enable 900 Pennhurst residents to be transferred to the community. In 1971, the McDowell report was prepared at a cost of $68,000. It detailed the programs and services needed to support the 900 Pennhurst residents in the community and provided a blueprint for the implementation of the Act. (Samuels, N.T. 23–9, 23–10, 23–55). Though seven years have passed since the Act was signed, few of the facilities have become operational. The Department of Public Welfare now expects this program to be completed by 1980. (*Id.*, N.T. 23–44). Over eighteen million dollars of this fund remains unspent but is allocated to building these facilities. (Stipulation, N.T. 7–97). As of April 25, 1977, however, only 37 Pennhurst residents have directly benefitted from the Act. (Samuels, N.T. 23–80).

Comparable facilities in the community are generally less expensive than large

isolated state institutions. Services can be purchased at regular rates, rather than at rates which must be paid to attract individuals to work in a setting like Pennhurst. (Conley, N.T. 11–107). The cost of running Pennhurst in 1976 was $27.8 million dollars, or $60 per resident per day. (*Id.*, N.T. 12–28). This does not include the fair rental value of the buildings at Pennhurst (estimated at $3–$4 per resident per day). (*Id.*, N.T. 11–114). The statewide cost of community living arrangements in Pennsylvania for 1976 was $17.64 per individual per day. (PARC Exhibit 63, 64). Program services, which ⅓ of mentally retarded individuals would need, average approximately $10 per individual per day. (Conley, N.T. 11–116, 11–117). Moreover, keeping the retarded individual in the community makes it possible for him or her to get employment. (Settle, N.T. 7–4). The lifetime earnings of a mildly retarded individual often exceeds $500,-000. (Conley, N.T. 12–32). For those with an I.Q. between 25 and 50, 45% of men and 12% of women earn about 20% of the average wage. (*Id.*, N.T. 12–31). When the retarded can work, the amount of financial support which society must provide decreases and the individuals may benefit society with the taxes they pay. Furthermore, the investment per individual at Pennhurst is primarily for warehousing and not for the individual's well-being or future planning, as is the case with community facilities. (*Id.*, N.T. 11–23, 11–24).

(446 F.Supp. at 1311–12 (footnotes omitted)).[1] The Court also found that the procedure for funding treatment and habilitation of the retarded gave the county defendants a financial incentive—unrelated to the relative habilitative benefits—to place retarded citizens in Pennhurst rather than in appropriate community facilities (446 F.Supp. at 1312–13).

The overwhelming weight of the evidence presented at trial, evidence uncontradicted by the defendants, mandated but one course of injunctive relief—placing the residents of Pennhurst in the community living arrangements being planned by the Commonwealth and the counties for the habilitation of the retarded (446 F.Supp. at 1325–29). In its first en banc decision in this case, the Third Circuit determined that this Court's original injunctive order had been too broad in that it ordered that all members of the plaintiff class be placed in appropriate community living arrangements and that Pennhurst eventually be closed. Said the Third Circuit:

> It is probably true, as the trial court found, that in general institutions are less effective than community living arrangements in facilitating the right to habilitation in the least restrictive setting. There is ample testimony on the record indicating the shortcomings of institutions as places for habilitation.

**1.** The Court's most recent opinion in this case, its Memorandum of June 11, 1982 (542 F.Supp. 619) determined, based on the evidence presented at a hearing held in April, 1982, that Pennhurst remains a more expensive means of treating the retarded than community living arrangements. In its Memorandum this Court noted

> [t]he evidence submitted at the April hearing shows that the Commonwealth might save substantial sums of money by complying with the March 2 Order [which requires the Commonwealth defendants to place Pennhurst residents in community living arrangements where community facilities constitute the least restrictive environment for those individuals]. As heretofore noted, it costs approximately $36,500 to provide a retarded citizen with transfer to a community

living arrangement and habilitation services for one year, and $27,500 for each succeeding year. *See* Exhibit P–24. According to the evidence presented at the hearing, the per capita cost for each retarded person at Pennhurst is $51,500 per year. Although the Commonwealth defendants are apparently convinced that the per capita costs of providing adequate habilitation in community living arrangements are far less than the per capita costs of providing similar services in institutions, the Commonwealth defendants have nonetheless appeared reluctant through the years to provide community living arrangements for the Pennhurst residents. *See* Exhibit P–10.

Memorandum of June 11, 1982, 542 F.Supp. at 628.

But ... For some patients a transfer from Pennhurst might be too unsettling a move. Long-term patients, for example, may have suffered such degeneration in the minimum skills needed for community living that habilitation outside an institution is a practical impossibility. . . . We need not decide that issue here. All that we need recognize is that there may be some individual patients who, because of advanced age, profound degree of retardation, special needs or for some other reason, will not be able to adjust to life outside of an institution and thus will be harmed by such a change. The case must therefore be remanded for individual determinations by the court, or by the Special Master, as to the appropriateness of an improved Pennhurst for each such patient.

612 F.2d at 114.

In making these individual determinations, the Third Circuit directed that this Court engage in "a presumption in favor of placing individuals in [community living arrangements]", but "the special needs and desires of individual patients must not be neglected in the process." 612 F.2d at 115. This Court, therefore, in accordance with the Third Circuit's first en banc opinion, entered an order deleting those paragraphs of the March 17, 1978 Order which enjoined admissions to Pennhurst (Order of April 24, 1980). That Order also established a Hearing Master for the purpose of conducting hearings for each Pennhurst resident for whom a community living arrangement has been prepared for the purpose of determining whether the proposed transfer to the community was "voluntary," as well as for the purpose of determining whether the proposed community living arrangement will be beneficial to his or her habilitation (in particular, whether the proposed community facility will be more beneficial than Pennhurst). When one of the defendants proposes to admit a retarded person to Pennhurst, the Hearing Master holds a hearing for the purpose of determining whether Pennhurst constitutes the least restrictive setting in which that person may receive minimally adequate habilitation.

The February 22 Order also set forth the procedure for the initiation and conduct of the aforementioned hearings and established the parameters of the Office of the Hearing Master. The Order of February 22, 1980 and other revisions in the original injunctive order necessitated by the Third Circuit's opinion were set forth in the comprehensive order of April 24, 1980, which remains the primary and controlling injunctive order in this case. See 673 F.2d 647, 651. In its second en banc opinion in this case, the Third Circuit observed that the United States Supreme Court, in remanding the case to the Circuit:

found no fault with the district court's findings of fact ... Moreover, the [Supreme] Court did not address those issues respecting scope of relief which are discussed in Part VII of our prior opinion. Thus, assuming the propriety of some legal standard upon which relief could be predicated, there is no occasion, for purposes of this appeal, for a reconsideration of our discussion of the Commonwealth's Eleventh Amendment contention, of objection to the definition of the class, of objections to the use of a master, or of other specific objections to provisions of the injunction which we rejected.

673 F.2d at 651. The Hearing Master's role and procedures are described in detail in this Court's order of April 24, 1980 (at pp. 64–73). The "voluntariness" hearings, held to determine whether the retarded person voluntarily wished to be placed in the community living arrangement specified in his or her Individual Habilitation Plan drawn by a planning assessment team of mental retardation professionals, were necessitated by the Supreme Court's Stay Order of June 30, 1980. This Stay Order provided that only voluntary transfers from Pennhurst to the community could be made pending final disposition of this case. On July 14, 1980, this Court held that the Stay Order did not prevent this Court from ordering "voluntary" transfers from Pennhurst to the community, and directed that the Hearing Master should conduct the aforesaid "voluntariness" hearings in addition to the Hearing

Master's duties as set forth in the order of April 24, 1980. On April 20, 1981, the Supreme Court opinion in this case, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 reversed the Third Circuit's first en banc opinion and remanded the case to the Court of Appeals for further proceedings. On October 13, 1981, the Commonwealth defendants filed with this Court a motion to discontinue the voluntariness hearings in light of the Supreme Court's decision on the merits. On February 22, 1982, this Court granted the Commonwealth defendants' motion and directed that the Hearing Master discontinue the voluntariness hearings. *See* Memorandum of February 26, 1982 at 6–7, 533 F.Supp. 661, 663 ("A review of applicable decisions indicates that a stay order issued by an appellate court terminates upon that court's disposition of the appeal in the absence of an order to the contrary"; Supreme Court Stay granted "pending final disposition" of Supreme Court's review of the case).

On February 26, 1982, pursuant to the Supreme Court's remand, the Third Circuit, again sitting en banc, affirmed this Court's decision and injunctive order as modified in light of the first Court of Appeals decision (673 F.2d 647). In its second opinion, the Third Circuit held that "the district court's order is supported by the [Pennsylvania Mental Health/Mental Retardation Act] Act of 1966 [50 Pa.Stat.Ann. Tit. 50 §§ 4101–4704 (Purdon 1969)], an independent state law adequate to that end" as interpreted by the Pennsylvania Supreme Court in the case *In re Joseph Schmidt*, 494 Pa. 86, 429 A.2d 631 (1981) (673 F.2d at 661). The defendants sought certiorari, which was granted by the Supreme Court on June 21, 1982.

*The Need for the Special Master*

The findings of fact made by this Court, based on the evidence presented at trial, established that the plaintiffs were entitled to such equitable relief as would assure their right to minimally adequate habilitation. It was clear that the appointments of a Special Master and, later, at the direction of the Third Circuit, a Hearing Master, were essential to providing that relief. For example, the evidence presented at trial concerning the abuses occurring at Pennhurst indicated that an impartial, independent, outside monitor was necessary to ensure that the retarded residents were no longer restrained, drugged, or otherwise physically harmed. Similarly, it was imperative that the community facilities, which all parties agreed were the only viable alternative for providing minimally adequate habilitation to the plaintiff class, be monitored to make certain that they were safe, sanitary, and beneficial to the habilitation of the retarded. The Commonwealth and County defendants, because of their long record of ignoring the inadequacies of Pennhurst, could not be depended upon to monitor the conditions at Pennhurst and to plan for the minimally adequate habilitation of the Pennhurst class. The Court found that it was necessary to appoint an impartial expert—the Special Master—to monitor the implementation of the remedy designed to curtail the violations of the plaintiff's rights. Neither the Commonwealth nor the County defendants ever filed an objection with this Court concerning the appointment of the Special Master. In fact, at no time during the course of this litigation has any defendant requested this Court to alter, reduce, or eliminate the Office of the Special Master. The Commonwealth defendants have never filed a motion pursuant to Fed.R.Civ.P. 60(b) suggesting that changed circumstances have eliminated the need for the Special Master. The Commonwealth defendants have, however, committed contempt of this Court's Orders by refusing to fund the Office of the Special Master. *See* Memorandum of August 25, 1981, 533 F.Supp. 631. They appealed this Court's finding of contempt to the Third Circuit, which affirmed this Court's findings and conclusions on February 26, 1982 (673 F.2d 628). In its opinion, the Third Circuit suggested that the Commonwealth defendants could file a Rule 60(b) motion if they felt that changed circumstances had eliminated the need for the Special Master. No such motion has ever been filed with this Court by the Common-

wealth defendants or any other party to this litigation.

As of March, 1978, the defendants had no program to develop individual habilitation plans for the retarded residents of Pennhurst. The defendants also lacked programs for inspecting the community living arrangements to be provided for the Pennhurst residents for whom such community facilities constituted the least restrictive environment in which they could receive minimally adequate habilitation through programs designed by retardation professionals.

For these heretofore discussed reasons, the Court established the office of the Special Master, fully intending that the Special Master's office would be a transitional entity and that the implementation of the injunctive relief ordered by this Court would ultimately be the responsibility of the defendants. As this Court noted in its Memorandum of November 18, 1981, 526 F.Supp. at 433,

It has never been the Court's intention that the Office of the Special Master become a permanent and continuous operation. This Court will not be reluctant to reduce the staff of the Special Master's Office whenever it is convinced that the Commonwealth and County defendants are moving with due diligence to effectuate the Court's Orders. As of the October 19th [of 1981] hearing, 870 people remained at Pennhurst. Whenever the Commonwealth and County defendants have provided living arrangements in the community for all Pennhurst residents, this Court would probably have no reason to continue the monitoring functions of the Special Master. Unfortunately, as the record in this case reveals, the defendants have not been diligently carrying out their responsibilities to the Pennhurst residents as required by this Court's Orders. Compliance with this Court's Orders requires a monitor who is not subject to the jurisdiction and control of the defendants.

526 F.Supp. at 434.

The record of compliance with the Court's Orders has not been encouraging. As this Court observed in its Memorandum of March 2, 1981, the defendants, despite the planning and monitoring efforts of the Special Master, were failing to implement the injunctive relief ordered by this Court, which noted that

despite this Court's orders, and despite the representations by the defendants of their intentions to comply with this Court's Orders, the retarded population of Pennhurst (from March, 1978, the date of the Court's original injunctive order) had been reduced by only 184 to a total of 972, as of the end of August, 1980—and not all of that reduction was due to community placements. The school-age residents of Pennhurst, the subject of two specific Court orders, had not been placed in the community by the extended deadline.

Memorandum of March 2, 1981 at 11. The compliance of the defendants with this Court's Orders can for the most part be described as "foot-dragging." Ironically, while the Commonwealth defendants were complaining that they lacked the resources to comply with this Court's Orders, they were, during this very period, transferring the mentally retarded from institutions located elsewhere in the state to community living arrangements. *See* Memorandum of June 11, 1982 at 20–21, 542 F.Supp. at 628; Memorandum of March 2, 1981 at 11.

Recently, there have appeared diverse opinions concerning the role of the Special Master in this litigation. *Cf.* 612 F.2d at 111–12 Third Circuit (majority opinion) with 101 S.Ct. at 1558–59 (White, J., dissenting); 673 F.2d at 665–70 (Garth, J., dissenting). The varying perceptions are understandable in light of the protracted history of this case. Thus, even at this late stage of the litigation, a full explanation of the functions of the Special Master and the Hearing Master is essential to understanding how recent developments have now made it possible to phase out the Special Master's office.

*The Function of the Special Master*

From its inception, the Office of the Special Master was charged with the primary

task of monitoring the defendants' compliance with the injunctive relief ordered by the Court. All the activities of the Special Master were necessary to assure compliance with the Court's Orders.

The Court's original relief order (Order of March 17, 1978) and subsequent relief orders (*see, e.g.*, Order of March 5, 1979) have specifically directed the defendants to provide the relief to which this Court found the plaintiff Pennhurst residents entitled to receive under the Constitution of the United States, as well as state and federal statutes. The Special Master was appointed with "the power and duty to plan, organize, direct, supervise and monitor the implementation of ... Orders of the Court." (Orders of March 17, 1978 and April 24, 1980). This grant of authority is specifically limited to the orders of the Court and was never intended as authorizing the Special Master to operate Pennhurst or any community living arrangement.

One primary task of the Special Master was to regularly monitor the community living arrangements to which Pennhurst residents were being transferred. This function of the Special Master was essential for the purpose of assuring that the Pennhurst residents were transferred to community facilities that were safe, sanitary, and beneficial to their habilitation. The Court has always been vitally concerned that no Pennhurst resident or any member of the plaintiff class be transferred to any community facility that is not beneficial to his or her habilitation. In particular, it is the function of the Special Master to make certain that the poor sanitation, the dangers to life and limb, and the lack of training programs which this Court found to exist at Pennhurst are not duplicated on a smaller scale in community living arrangements. This function of the Special Master was particularly necessary in that the defendants had been operating without rules, regulations or policies designed to make certain that the community living arrangements for the retarded are safe and sanitary, and that the programs and services necessary for minimally adequate habilitation were being provided.

Another primary function of the Special Master was to review individual habilitation plans for each retarded member of the class in order to ensure that the plan for each of the retarded residents provide for such minimal care and services as would enable them to cope with life as effectively as their capacities permit. This function of the Special Master was essential in light of the Court's finding that individual habilitation plans had not been prepared for the Pennhurst residents. The orders of this Court require the defendants to provide an individual habilitation plan for each retarded resident of Pennhurst in order to make certain that each receives such minimal care and services as will be beneficial to his or her habilitation.

The third primary function of the Special Master was and is to monitor conditions at Pennhurst. This monitoring function has been essential in order to make certain that the abuses this Court found to exist at Pennhurst were corrected. Among the abuses which the Court found to exist were: (a) punishment of the residents by solitary confinement; (b) unregulated use of physical restraints; (c) use of superfluous and dangerous drugs; (d) the administration of drugs for staff convenience; (e) inadequate programs for habilitation; (f) force-feeding of residents in supine positions; (g) unsanitary living conditions; (h) exposing residents to unnecessary dangers. As this Court found in 1977, the retarded living at Pennhurst had regressed rather than progressed in their abilities to perform the basic functions required for daily living (446 F.Supp. at 1308). The monitoring function of the Special Master in connection with conditions at Pennhurst has never been considered by this Court or the Special Master as authorizing the Special Master to "run" Pennhurst.

The injunctive relief ordered by this Court (Order and Memorandum of March 17, 1978; Order of March 5, 1979) as modified in light of the Third Circuit's decision (612 F.2d 84) (Order and Memorandum of April 24, 1980) requires that individual ha-

bilitation plans be developed for each resident of Pennhurst and other retarded members of the plaintiff class. These proposals are developed by a Planning and Assessment Team (PAT) which includes but is not limited to the Pennhurst resident, the case manager, and the parent, guardian or certified advocate of the Pennhurst resident. Frequently joining this team are the day program and residential program providers for the retarded client as well as medical and habilitation specialists. The Special Master's role in the development of the individual habilitation plan has been limited to monitoring in order to make certain that a plan has been formulated in accordance with professional standards for each Pennhurst resident in order that each of them will have a reasonable opportunity to acquire and maintain such life skills as are necessary to enable him or her to cope as effectively as his or her capacities permit. The Special Master has never determined which Pennhurst residents will be moved to the community, when they will move, or where they will move. Such decisions have been and continue to be the responsibility of the defendants pursuant to this Court's Orders.

On January 1, 1982, the Commonwealth defendants began to assume the task of reviewing the individual habilitation plans developed for the residents of Pennhurst (see Dkt. Nos. 1467–71 and Letter of December 18, 1981 from Jennifer Howse to Carla Morgan). On February 1, 1982, the Commonwealth defendants began to assume the task of inspecting the community living arrangements to which the members of the plaintiff class are being transferred pursuant to their professionally developed individual habilitation plans (see Dkt. No. 1466, Letters of Carla S. Morgan, Special Master and Jennifer L. Howse, Deputy Secretary of Commonwealth Department of Public Welfare). Although this process is not yet complete, (see Dkt. Nos. 1465, 1536, Reports of the Special Master regarding Commonwealth assumption of duties) the Court is optimistic that this transfer of functions will soon be completed. Thus, at this juncture, the Special Master's office

continues to monitor the conditions at Pennhurst and is completing the orderly transfer of the individual habilitation plan review and community living arrangement inspection functions. The staff and budget of the Office of the Special Master has decreased significantly (approximately 50 percent) during the past year. In January, 1981, the Special Master's Office had a staff of 14 persons and a six-month operating budget of $294,433. The Special Master's Office currently has a staff of six persons and a six-month operating budget of $170,-151.

On October 19, 1981, this Court held a hearing to determine whether the Office of the Special Master was duplicating functions performed by the defendants. Based on the evidence presented at that hearing, the Court found that the Special Master had not duplicated and was not duplicating any services being performed by the defendants. See 526 F.Supp. 428 (Memorandum of November 18, 1981). Furthermore, in order to alleviate any misunderstanding concerning the functions of the Special Master, this Court on April 1, 1982 entered an Order amending the injunctive language relating to the Office of the Special Master. The purpose of this amendment was to "lay to rest once and forever the perennial contention that the Special Master possesses powers over and beyond the designated function of monitoring compliance with this Court's Orders in this case." (536 F.Supp. at 523).

A reading of the entire record in this case substantiates this Court's finding that the Special Master has always been necessary to effectuate the relief to which the retarded residents of Pennhurst were entitled. However, this Court has, from the outset, intended that the Special Master's role be limited, temporary, and transitional. Although this Court has not received any motions from any party in this litigation, suggesting this, the Court has determined that the time has come to phase out the Special Master's Office.

*The Declining Need for the Special Master*

Though this Court has often been dismayed at the slow pace with which its Orders have been carried out, there has been progress. As of March 17, 1978, Pennhurst had a population of 1,156 persons. Assuming that the defendants will be in full compliance with this Court's Order of March 2, 1981, which directs them to have completed the transfer of a specific number of Pennhurst residents prior to September 30, 1982 to community living arrangements, only about 600 retarded persons will remain as residents at Pennhurst. The Pennhurst residents who have been transferred to community living arrangements are receiving minimally adequate habilitation in community living arrangements, a less restrictive environment than that in which they had been confined at Pennhurst. As this Court noted in its Memorandum of September 11, 1981:

> The transfers from Pennhurst to date have in the main provided each of the retarded residents of Pennhurst such minimally adequate habilitation as will give them the opportunity to acquire and maintain such life skills as are necessary for them to cope with life as effectively as their limited capacities will permit. Although a few of the retarded residents of Pennhurst and their families have demonstrated a reluctance to leave the institution, the overwhelming majority are now happy for the freedom to begin a life which offers the assurance of a better life.

526 F.Supp. at 423.

Regularly conducted follow-up surveys of the progress of these persons shows that the retarded residents of Pennhurst, when placed in community living arrangements, not only cease to regress, but are showing substantial improvement in their life skills. Most psychologists accept the Adaptive Behavior Scale as a measure of a retarded person's life skills. In Chester County facilities, for example, Pennhurst class members in community living arrangements have increased their Adaptive Behavior Scale score by an average of 15 points (on a 128-point scale). As a whole, the Pennhurst class members receiving habilitation in the community have shown substantial increases in measured intelligence, neuromotor skills, and adaptive behavior (an average of six points for the five-county Southeast Region of Pennsylvania). *See* C. Feinstein, J. Lemanowicz, J. Conroy, *Pennhurst Study: Progress of Clients in Community Living Arrangements 5–8* (September 19, 1981). The regularly compiled reports of the Special Master state that the community facilities in which Pennhurst class members live are safe and sanitary, and that the class members are participating in training programs designed to provide them with minimally adequate habilitation.

Although the monitoring reports compiled by the Office of the Special Master indicate that the conditions at Pennhurst have improved, unfortunately there continue to be reports of incidents of unnecessary injury to and abuse of residents. *See* Woestendiek, *Pennhurst Probe Finds Patient Abuse*, Philadelphia Inquirer, August 11, 1982 at 1–A, col. 1). In amending its orders to eliminate the Office of the Special Master, it will therefore be necessary for this Court to establish additional safeguards for those retarded persons remaining at Pennhurst.

This Court's Order directing the phasing out of the Office of the Special Master should not be interpreted as an indication that this Court will be less vigilant in insisting that the defendants comply with its Orders. As the defendants are now aware, the Court will not hesitate to take appropriate remedial action whenever it finds that such action is necessary to protect the members of the Pennhurst class. *See, e.g.,* Memorandum of March 2, 1981; Memorandum of August 25, 1981 (533 F.Supp. at 631); Memorandum of September 11, 1981 (526 F.Supp. 414).

*Friend-Advocate Program and Revision of this Court's Injunctive Orders*

The planned closing of the Special Master's Office may make it necessary for the plaintiff class to assume a more active role in informing the Court of any non-compli-

ance with the Court's Orders. It may also be necessary for the Court to assure that some type of a friend advocate system is operative in order to speak on behalf of those retarded residents who do not have a close relative dedicated to their habilitation and safety.

The imminent closing of the Office of the Special Master obviously alters the Court's plan for monitoring the implementation of the injunctive relief ordered by this Court. The Court's Order of April 24, 1980 must therefore be amended. The Court will enter an Order setting a hearing to determine the amendments necessary to the April 24, 1980 Order so that the Orders of this Court will accurately reflect an enforcement mechanism necessary to replace the monitoring functions of the Special Master.

On many occasions, the defendants have contended that they could better effectuate this Court's Orders without the presence of the Office of the Special Master. The Court will now give them the opportunity to make good on this claim and will enter an Order directing that the defendants provide the Court with updated plans for placing Pennhurst class members in appropriate community living arrangements during the remainder of the 1982–83 fiscal year (through June 30, 1983) and for achieving overall compliance with this Court's injunctive Orders. A hearing will be scheduled to determine whether the defendants' plans are appropriate and consistent with the injunctive relief ordered by the Court.

Finally, the Special Master is directed to submit to this Court on or before August 30, 1982 a proposal for the phasing out and closing of the Office of the Special Master by December 31, 1982. Appropriate orders will be accordingly entered.

### ORDER

AND NOW, this 12th day of August, 1982, for the reasons set forth in this Court's Memorandum of August 12, 1982,

IT IS HEREBY ORDERED: The defendants shall submit to this Court, on or before September 15, 1982, their: (1) plans to provide community living arrangements to-

gether with all services required by the retarded person's individual habilitation plan for Pennhurst plaintiff class members (not covered by the School-Age Order) in the Southeast Region of Pennsylvania (Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties) during the period commencing October 1, 1982 and closing June 30, 1984; (2) plans to provide community living arrangements together with all the services required by the retarded person's individual habilitation plan for retarded persons in the Southeast Region of Pennsylvania who are not members of the Pennhurst plaintiff class for the period commencing October 1, 1982 and closing June 30, 1984; and (3) plans to provide community living arrangements together with all the services required by the retarded person's individual habilitation plan for Pennhurst plaintiff class members (not covered by the School-Age Order) from counties outside the Southeast Region of Pennsylvania during the period commencing October 1, 1982 and closing June 30, 1984; (4) plans designed to assure compliance with this Court's Order of April 24, 1980.

