Terri Lee HALDERMAN et
al., Plaintiffs,

v.

PENNHURST STATE SCHOOL AND
HOSPITAL, et al., Defendants,

United States of America,
Plaintiff-Intervenor,

Pennsylvania Association for Retarded
Citizens et al., Plaintiffs-Intervenors.

Civ. A. No. 74–1345.

United States District Court,
E.D. Pennsylvania.

June 13, 1983.

David Ferleger, Philadelphia, Pa., for
Terri Lee Halderman.

Thomas M. Kittredge, Philadelphia, Pa.,
for Bucks, Chester and Delaware Counties.

Robert B. Hoffman, Deputy Atty. Gen.,
Harrisburg, Pa., for the Com. of Pa.

Thomas Gilhool, Philadelphia, Pa., for
Pennsylvania Ass'n for Retarded Citizens.

Herbert B. Newberg, Philadelphia, Pa.,
for David Ferleger, Esq.

Pamela P. Cohen, Philadelphia, Pa., for
Pennhurst Parents Ass'n.

Terissa Chaw, Civil Rights Div., Dept. of
Justice, Washington, D.C., R. Stephen Bar-
rett, Asst. County Sol., Norristown, Pa., for
Montgomery County.

Marc H. Myers, Asst. City Sol., Philadel-
phia, Pa., for Philadelphia County.

## MEMORANDUM

RAYMOND J. BRODERICK, District
Judge.

Pursuant to the injunctive relief ordered
by this Court in 1977 designed to provide
the retarded residents of Pennhurst their
statutory and constitutional rights, an Indi-
vidual Habilitation Plan (IHP) was drafted
for L.P., a class member. The IHP called
for L.P.'s movement from confinement at
Pennhurst to a community living facility in
Montgomery County. L.P.'s parents initial-
ly objected to the placement and demanded
a hearing before the Hearing Master estab-
lished by this Court's Order of April 24,
1980 as required by the Third Circuit's first
en banc opinion in this case (see 612 F.2d 84,
112 (3d Cir.1979)). Prior to this hearing,
the parents withdrew their objections to
L.P.'s community habilitation, based in part
upon representations made to the parents
by the Commonwealth, Montgomery Coun-
ty, and the private care providers obtained
by these governmental entities. However,
the Hearing Master discovered that these
representations were not in fact accurate
and held a hearing to determine whether
the parents' consent had been obtained in
violation of due process (Hearing Master's
Report of January 4, 1983 at 2).

After a hearing, the Hearing Master de-
termined that community residence would
be more beneficial to L.P. than remaining
at Pennhurst, but that, due to the refusal of

the Commonwealth defendants to provide adequate funding for the private care provider obtained by the County and Commonwealth, L.P. would be unable to receive habilitation and services in accordance with his IHP. The Hearing Master ordered the Commonwealth defendants to reimburse the private care provider at a specified per diem rate for the care and training of L.P. The Commonwealth defendants took exception to the Hearing Master's Report and Order of January 4, 1983 contending that the per diem rate was too high. Montgomery County and the private care providers' Shiloh, Inc. and Prospectus, Inc., also took exception to the Hearing Master's Report, contending that the per diem was too low. This Court held a hearing on the exceptions on April 13, 1983. For the reasons hereinafter set forth, this Court will enter an Order modifying the Hearing Master's Order. The Court will order that the defendants ensure that L.P. receive habilitation in the community as required by his IHP but will vacate that portion of the Hearing Master's Order which sets a specified per diem rate of reimbursement to Shiloh and Prospectus.

Before discussing the specifics of L.P.'s situation, some background discussion is in order. In 1977, this Court, after 32 days of trial, set forth findings of fact and conclusions of law which determined that the constitutional and statutory rights of the retarded residents of Pennhurst were being violated by their continued confinement at Pennhurst (see Memorandum of December 23, 1977, 446 F.Supp. 1295). The Court instructed the parties to attempt to agree on the form of order necessary to provide to the plaintiff class injunctive relief to ensure that they received their rights as set forth in the Memorandum of December 23, 1977. However, no agreement was forthcoming. On March 17, 1978, this Court entered its original injunctive Order in this case which mandated, inter alia, the movement of Pennhurst residents to appropriate community living facilities where they would receive minimally adequate habilitation in the least restrictive environment. This Order was affirmed but modified by the Third

Circuit. The Circuit Court directed that individual determinations be made for each class member as to the appropriate habilitation. As the Circuit Court reasoned, there might be some individuals who "because of advanced age, profound degree of retardation, special needs or for some other reason, will not be able to adjust to life outside of an institution." (612 F.2d at 114). The Circuit Court therefore remanded the case to this Court for individual determinations "as to the appropriateness of an improved Pennhurst for each such patient." (612 F.2d at 114). In so doing, the Third Circuit directed that "the court or the Master should engage a presumption in favor of placing individuals" in the community. (612 F.2d at 115). As suggested by the Third Circuit, this Court established the Hearing Master for the purpose of making individual determinations when necessary. (See Order of April 24, 1980).

After the Third Circuit's 1979 en banc opinion in this case, certiorari was granted on June 10, 1980. On April 20, 1981, the United States Supreme Court reversed the Third Circuit's determination that the Bill of Rights for the Handicapped contained in the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6010, created in favor of the mentally retarded a substantive right to appropriate habilitation and treatment in the least restrictive environment. The Supreme Court remanded this case to the Third Circuit for consideration of the federal constitutional and statutory issues, as well as the state law questions raised by this Court in its December 23, 1977 decision. (See 451 U.S. 1, 101 S.Ct. 1531, 1546–47, 67 L.Ed.2d 694).

On February 26, 1982, the Third Circuit, pursuant to the Supreme Court's remand, issued its second en banc decision in this case. The Third Circuit again affirmed, holding that Pennsylvania's Mental Health/Mental Retardation Act of 1966, 50 Pa.Stat.Ann. §§ 4101–4704 (Purdon 1969), granted Pennsylvania's retarded citizens the right to adequate habilitation in the least retrictive environment. (See 673 F.2d 628 (3rd Cir.1982)). The Third Circuit again

affirmed the injunctive relief ordered by this Court on March 17, 1978 as amended in the Order of April 24, 1980. Although the Supreme Court again granted certiorari on June 21, 1982, there is no stay of this Court's Orders mandating the community placement of those Pennhurst residents whose individual habilitation plans require community living facilities in order to provide them minimally adequate habilitation.

Thus, pursuant to the Court's injunctive Orders, a planning and assessment team composed of mental retardation professionals, including L.P.'s case manager who is an employee of Montgomery County, and Pennhurst staff professionals, who are state employees, prepared an IHP for L.P. L.P.'s parents, Mr. and Mrs. A.P., were also involved at every stage of the planning and review process, as required by this Court's Order of April 24, 1980. The plan provided that L.P. should be transferred to a community living facility in Montgomery County and that he receive a specified level of services, staffing care, and habilitation while at the community home. L.P.'s IHP also called for him to receive habilitation, training, and education during the day from a "day program provider". The community residence to which L.P. was transferred was to be administered by Shiloh, Inc., a private contract provider selected by the county and approved by the Commonwealth. Shiloh had subcontracted with Prospectus, Inc. to provide L.P.'s day-care programs.

The Commonwealth of Pennsylvania, through the Pennhurst Implementation Team's Special Management Unit, which is a division of the state Department of Public Welfare's Office of Mental Retardation (DPW/OMR), approved L.P.'s IHP and found it to be more beneficial to L.P.'s habilitation than continued confinement at Pennhurst. Montgomery County also approved of L.P.'s IHP. The Office of the Special Master, which is no longer in operation, also approved the IHP. (The Special Master's Office ceased its existence on December 31, 1982; see Memorandum of August 12, 1982, 545 F.Supp. 410).

There appeared to be no problem at the time L.P. was transferred from Pennhurst. He is a 50-year-old retarded person who is classified as profoundly mentally retarded, but who possesses a substantial amount of life skills, including speech and independent ability to attend to his personal hygiene. (See Hearing Master's Report of November 1, 1982, Dkt. No. 1638, at 2). The community living facility is a four-bedroom house in Lansdale where he would receive services designed to provide him a higher quality of care, training, and habilitation, something which the mental retardation professionals familiar with his situation unanimously agreed would provide L.P. with minimally adequate habilitation.

Shortly after L.P. was transferred to the community facility, a problem developed concerning funding at his community home. It was the plan of both the state and county that L.P. was to receive his community residence and habilitation in a home that would be funded pursuant to the Small Intermediate Care Facility for the Mentally Retarded (ICF/MR) program. The ICF/MR program is a part of Title XIX of the Social Security Act and provides that, where certain conditions are met, a state and county may furnish a retarded person with a community living facility and receive 55% federal funding. Prior to the advent of the small ICF/MR program only large institutions such as Pennhurst had been eligible for the 55% federal funding provided by the ICF/MR program. The 55% federal funding under the prior ICF/MR program was encouraging states to ignore the fact that institutionalization of the retarded was not providing the minimally adequate habilitation which this Court had ordered. In 1974, the ICF/MR program was revised to permit 55% federal funding in those situations where the mentally retarded were transferred to small ICF/MR community facilities, as well as large ICF/MR institutions.

Under the amended ICF/MR program, a residential habilitation facility in the community must be designed and constructed to accommodate between four and ten mentally retarded persons residing at the facili-

ty. The state initially bears the cost of operating the residence and the daytime training programs, but is reimbursed by the federal government for 55% of these costs. No county funds are involved but the counties of Pennsylvania select the retarded persons to receive community habilitation and for planning the particular type of programs which will provide these individuals with minimally adequate habilitation in the least restrictive environment as required by law. *See Halderman v. Pennhurst,* 673 F.2d 628; *In re Schmidt,* 494 Pa. 86, 429 A.2d 631 (1981); *In re Sauers,* 68 Pa. Cmwlth. 83, 447 A.2d 1132, 1136 (Pa.Comm. Ct.1982).

Some clarification of terms is perhaps necessary. This Court has heretofore discussed ICF/MR community residences, community living arrangements, and 2176 Waiver community facilities. This Court has consistently considered all three types of community facilities as providing the minimally adequate habilitation required by the Court's Orders. The small ICF/MR community facilities have heretofore been discussed.

A Community Living Arrangement (CLA) is a community facility that is 100% state funded. In Pennsylvania, CLAs contain an average of approximately three residents. In order to qualify for 55% federal funding pursuant to the small ICF/MR program, a community facility must contain a minimum of four residents. Because this and other ICF/MR requirements for obtaining 55% federal funding pursuant to the ICF/MR program constrained the flexibility of the states in meeting the needs of their retarded citizens through federally aided programs, Congress, in the Omnibus Budget Reconciliation Act of 1982, created the 2176 Waiver program as a new part of Title XIX of the Social Security Act. If a state applies for and obtains approval from the federal government, it may operate CLAs containing less than four residents and yet obtain 55% federal funding. Thus, the major distinction between the state-funded CLA, the ICF/MR and the 2176 Waiver CLA is their source of funding and administration. All three community facilities are designed to provide the retarded minimally adequate habilitation in a more normal, less segregated, less restrictive environment than institutions for the mentally retarded such as Pennhurst.

As this Court has frequently noted (*see* 545 F.Supp. 410 (E.D.Pa.1982); 542 F.Supp. 619 (E.D.Pa.1972); 526 F.Supp. 428 (E.D.Pa. 1981)), the Commonwealth has been slow to explore the possibility of participation in the ICF/MR and 2176 Waiver programs which would reduce the cost to the state of operating programs for the mentally retarded by as much as one-half. This Court was pleased to hear in 1981 that the state was planning to participate in the ICF/MR program in order to provide Pennsylvania's retarded with their rights under the 1966 Act at a lower cost to the state. The Commonwealth represented to the Court during 1981 and 1982 that it was beginning to participate in the ICF/MR program in order to provide services to the retarded and to comply with this Court's Orders at a reduced cost to the state. Pennsylvania has been one of the last states to participate in the ICF/MR program, claiming that it declined to participate at an earlier date in order that the state court anticipate and avoid any problems in the implementation and administration of the program.

One would have expected great things when the defendants determined that L.P. would receive habilitation in accordance with his individual habilitation plan at an ICF/MR community facility. Instead, L.P., like other class members selected for ICF/MR residence (*see* Report of the Hearing Master re T.M. and A.B., Dkt. No. 1677, November 23, 1982), has had his constitutional and statutory rights jeopardized by bureaucratic infighting that directly contravenes this Court's injunctive orders in this case.

As heretofore noted, this Court's 1977 decision found that the retarded class members possessed certain constitutional and statutory rights which were not being fulfilled at Pennhurst. Consequently, comprehensive injunctive relief was required to

rectify this situation and ensure that they received treatment and habilitation commensurate with their legal rights. For this reason, this Court, in its Order of March 17, 1978, established the requirement that each class member have developed for him or her an Individual Habilitation Plan (IHP) and that this plan would contain the judgment of mental retardation professionals as to what residence, living accommodation, and education would be required for that retarded person in order to provide him or her with minimally adequate habilitation in the least restrictive environment. The IHP, a product of professional evaluation by professionals employed by the defendants, sets forth concrete, specific, and individualized terms a minimally adequate habilitation plan for that retarded person. In L.P.'s case, the Commonwealth and County defendants both approved L.P.'s IHP. Shiloh had obtained Commonwealth approval to operate several ICF/MRs, including the facility to which he was transferred. At this juncture, the prospects for L.P. appeared bright. He left Pennhurst for a community home wherein he would receive the habilitation specified in his IHP. Unfortunately, a dispute which developed between the Commonwealth defendants and Shiloh threatens to close the community home to which L.P. was transferred.

Sometime after the IHP was approved and after Shiloh received its certificate of operation from the Commonwealth, the Commonwealth defendants refused to provide to Shiloh funds for the operation of the ICF/MR facility in which L.P. was residing.

Pursuant to the ICF/MR program as operated by the Commonwealth, various habilitation and residence providers obtained certification from the Commonwealth to function as community facility providers. For L.P., Montgomery County and the state selected Shiloh to provide him with residence and habilitation in accordance with his IHP. At the time Shiloh was selected, no rates of reimbursement to Shiloh were determined. Shiloh was to submit request vouchers to the Commonwealth for the reasonable costs incurred in providing care and services to L.P. and the Commonwealth,

pursuant to the agreement entered into between Shiloh and the state, was to reimburse Shiloh for its reasonable costs in serving L.P.'s needs. As heretofore noted, L.P.'s needs were defined by the IHP.

Shiloh requested reimbursement at the rate of $165.52 per client per day to provide L.P. with the residential and day-care required by his IHP. The Commonwealth, pursuant to its administration of the ICF/MR program, approved for this ICF/MR a budget for fiscal 1983 (July 1, 1982 through June 30, 1983, the state's fiscal year) of only $186,725.00, or a per diem per resident rate of $127.89. (*See* Master's Report of January 4, 1983, Dkt. No. 1733 at 8).

The Commonwealth defendants arrived at their figure through their procedure for reviewing requests for reimbursement in the ICF program. As heretofore noted, the federal government has long made available 55% federal funding to states operating varying types of Intermediate Care Facilities (ICFs). As previously noted, however, most ICFs have, until recently, been only large institutions for the mentally retarded (such as Pennhurst) or for the mentally ill, or nursing homes. Thus, the state was somewhat familiar with the administration of an ICF program and had established a procedure for selecting and approving ICF providers and their requested reasonable cost reimbursement rates. However, until the recent advent of the small ICF program for the community habilitation of the mentally retarded, the state had dealt with only large institutions. A substantial portion of the state's ICF program involved nursing homes which, by definition, provide a more uniform degree of care for a relatively large number of individuals who all receive approximately the same level of services. Consequently, when assessing the appropriateness of a reimbursement rate for individuals at a nursing home, the DPW, through its Office of Medical Assistance (OMA), has found it effective to determine an average per diem per resident cost at nursing homes throughout the state and to use this figure as a measuring stick for requested reim-

bursements. Under this system, OMA generally approves as reasonable those requested reimbursements falling below the state average but imposes greater scrutiny on those which exceed the average.

The dispute concerning Shiloh's rates has an already long history. During the summer of 1982, DPW/OMA announced that it would establish caps for rates of reimbursement requested by ICFs and set forth for public comment a suggested cap figure based in part on the ICF averages. This announcement brought an outcry from the small ICF/MR providers and counties depending upon the successful operation of the ICF/MR program for fulfilling this Court's Orders in *Halderman v. Pennhurst.* The counties, principally Philadelphia and Montgomery Counties, and the private ICF/MR providers contended that any such cap as formulated by OMA was unrealistic in light of the particularized needs of the retarded individuals destined for community habilitation in an ICF/MR. Quite simply, they pointed out that community habilitation of the retarded is a more complicated, more individualized, and often more expensive task than administering a nursing home for essentially normal and healthy but elderly persons.

A conference concerning this dispute and its impact upon this case was held in chambers in September, 1982, at which time the Commonwealth, through DPW/OMA Deputy Secretary Gerald Radke conceded that the caps first suggested and the formula for deriving them were inappropriate in the context of ICF/MRs. Radke added, however, that DPW had reopened the administrative process for determining a fair means of figuring ICF/MR caps and that the Department remained committed to the caps as a budget control measure. The counties, speaking for the ICF/MR providers, contended that any cap program was useful only in identifying providers who might not be cost-efficient and that the actual dollar determination of the correct per diem reimbursement rate would require case-by-case assessment. The Court directed these parties to meet and negotiate to attempt to resolve their dispute but no

agreement has been forthcoming. Both Philadelphia and Montgomery Counties have since filed motions with this Court asking that the Court direct the Commonwealth defendants to provide an "adequate" rate of reimbursement to ICF/MR providers so that the counties would be able to place retarded class members in ICF/MR community homes in order to fulfill the requirements of the Court's Orders. (This Court's Order of June 14, 1983, Dkt. No. ——, will, for the reasons set forth in this Memorandum, grant the motions of Philadelphia County and Montgomery County).

Against this backdrop, L.P., a retarded class member, became a pawn in this bureaucratic economic dispute. As heretofore noted, an IHP had been drafted for L.P. by mental retardation professionals and the Commonwealth defendants had approved this IHP. A private ICF/MR provider had been obtained for L.P., and then after L.P. was moved to the community facility, the Commonwealth defendants determined that they would reimburse Shiloh for only three-fourths of the amount claimed as necessary to provide residence and habilitation for L.P. in accordance with his IHP.

In December, 1982, the Court was advised that the reimbursement offered by the Commonwealth was unacceptable to Shiloh and that Shiloh was contemplating closing its ICF/MR in which L.P. resided and returning L.P. to Pennhurst. This Court, in its Order of December 22, 1982, enjoined the defendants from returning L.P. to Pennhurst. In order to avoid ceasing operations, Shiloh, which represented that it could not function as planned on the funding offered by the state, reduced the level of services being provided to L.P. Currently, L.P. is receiving fewer services than set forth in his IHP. Obviously, this development imperiled L.P.'s minimally adequate habilitation and his receipt of his legal rights. L.P. has since been transferred from the Lansdale ICF/MR first planned for L.P. to one operated by Shiloh in Pennsburg because the funding shortage has forced Shiloh to close two of its five community habilitation facilities. (*See* Hearing

Master's Report of November 1, 1982; January 4, 1983). The parties agree that L.P. is not now receiving all the services, staffing, and habilitation set forth in his IHP due to the rate dispute.

The Hearing Master, at the extended hearing concerning L.P., attempted to determine which of Shiloh's requested reimbursement amounts were reasonable and necessary in light of L.P.'s IHP. Finding this amount to be $148.58, the Hearing Master ordered that the Commonwealth defendants remit this amount to Shiloh for each day in which L.P. resided in the community and received habilitation. The Commonwealth defendants have not paid these amounts but have taken exception to the Hearing Master's Report, contending that the Master had no authority to set a specific dollar amount for per diem reimbursement for L.P.'s residence and care.

■ At a hearing held before this Court on April 13, 1983, the Commonwealth defendants did not dispute any of the facts or conclusions of the Hearing Master's Report of January 4, 1983. Rather, the Commonwealth defendants based their exceptions on their contention that the Hearing Master could not direct the state to pay a particular per diem rate. The Commonwealth defendants presented no evidence at the hearing to dispute the Hearing Master's findings. For that reason, this Court will treat the Hearing Master's findings as uncontested. Nonetheless, this Court has reviewed the record of the hearing before the Hearing Master (a three-volume transcript compiled by an official federal court reporter; Dkt. Nos. 1719, 1720, 1721 (filed December 29, 1982), and finds that the Hearing Master's findings are not clearly erroneous.

In fact the record before the Master is crystal clear. The Commonwealth defendants have refused to pay to Shiloh the requested per diem reimbursement rate largely because they prefer a lower level of staffing and services for L.P. than that set forth in his IHP. The Commonwealth contends that it has done this as part of a general effort to control the costs of the ICF/MR program.[1]

The Commonwealth, in determining what it would pay to Shiloh in connection with L.P.'s care, did not give adequate consideration to the contents of L.P.'s individual habilitation plan. Thus, when the Commonwealth reviewed Shiloh's reimbursement request, and thought the figure too high, it refused to pay to Shiloh certain funds associated with particular staffing and programmatic needs of L.P. as set forth in his IHP. The Commonwealth has taken the position that such services and staffing could be dispensed with in the interests of budget control. See Testimony of Dr. David Smith, D.P.W. Budget Officer, N.T. at 530–55; Testimony of Gerald Radke, DPW/OMA Deputy Secretary, N.T. at 350–58; Testimony of DPW/OMR Deputy Secretary Jennifer Howse, N.T. at 47–51; see also Hearing Master's Report of January 4, 1983 at 8, 11, 24–26.

The Commonwealth's actions in ignoring the IHP prepared by the professional planning team is a violation of this Court's Orders. This Court's Order of March 17, 1978, as amended April 24, 1980, requires that the defendants provide to the retarded class members community living facilities "together with all the services required by the retarded person's Individual Habilitation Plan." See Order of April 24, 1980 at 3–4. See also Memorandum of December 22, 1982, 555 F.Supp. 1138 (E.D.Pa.1982). A federal court's injunctive order issued to redress legal wrongs cannot be disregarded by those to whom it is directed. This Court's Orders required the defendants in this litigation to provide minimally adequate habilitation to the retarded members of the class. The minimal habilitation

---

1. The IHP is not a plan cast in concrete. This Court's Order of April 20, 1980 provides that the professional planning team shall review each class member's IHP every six months. If someone on the planning team desires an immediate revision of the IHP, a special team meeting can be convened. Upon agreement of the team of habilitation professionals, a retarded class member's IHP can be revised. However, the IHP may not be amended in a de facto manner by the unilateral conduct of one of the defendants.

which the defendants must provide is set forth in each class member's IHP. The Commonwealth defendants who, under the state statute, fund community care for the retarded, must ensure that plaintiff class members such as L.P. receive habilitation in accordance with their IHPs. The Commonwealth defendants are not relieved of this obligation on the ground that they have been engaged for the past eighteen months in a dispute with the contract provider concerning the rate at which the provider should be reimbursed for providing L.P. with minimal habilitation which state and county professionals determined to be necessary for L.P.

The dispute between the Commonwealth and Shiloh appears to be one of contract. This Court is not concerned about the bureaucratic dispute between these two entities. The Court's sole concern is the receipt by L.P. of his legal rights and services in accordance with his IHP. These services may be provided by the state, the county, or a private contract provider so long as L.P. receives services in accordance with his IHP.

The Commonwealth's sudden concern about L.P.'s ICF/MR costs seems to this Court inconsistent with its willingness to pay high costs for other retarded persons. In the matter of L.P., DPW has balked at paying a per diem of $164.00 per day for L.P.'s residence and care. However, the per diem per resident cost at Pennhurst, which is also an ICF, is $180.00 per day. (See Memorandum of June 11, 1982, 542 F.Supp. 619). The average per diem cost of a CLA in Montgomery County is approximately $175.00 per day. As heretofore noted, CLAs are 100% state-funded and small ICF/MRs are only 45% state-funded and 55% federally-funded. Thus, the Commonwealth has been paying per diems of $175.00 per day at CLAs in Montgomery County and it is now refusing to pay a net per diem of $74.48 per day (the state's share of L.P.'s per diem at Shiloh's requested reimbursement rate). As the Hearing Master stated "[W]hile there was no direct evidence [at the hearing] of these [Commonwealth] officials commanding their subordi-

nates to frustrate the District Court's orders, in light of the views they [the Commonwealth officials] expressed at the [L.P.] hearing the result could hardly have been otherwise." (Report of January 4, 1983 at 24).

■ However, as heretofore pointed out, this Court does not intend to become involved in this particular funding dispute. The remedy ordered by the Hearing Master is not one preferred by the Court. As previously noted, the Commonwealth contends that the Hearing Master may not order payment of a particular per diem reimbursement rate. The Court takes no position on this argument at this time. Although the Court now perceives no reason why it should become involved in the state's own administrative function in supervising the ICF/MR program and determining the rate of reimbursement to contractors, the day may come where the only means of effecting a valid federal court order would be an order such as the Hearing Master's Order that Shiloh receive a certain amount of funding so that L.P. could receive habilitation consonant with his IHP and his legal rights. If such a remedy were in fact the least drastic means of fulfilling a court order, principles of federalism and comity would have to yield to the federal Constitution and its Supremacy Clause, thereby permitting such a federal court order, through either the Court or the Hearing Master, despite its obvious impingement on the state's functions.

In this case, however, there remain available to this Court other means for enforcing its Orders in this litigation. For that reason, the Court will not affirm this portion of the Hearing Master's Order but will instead direct that the Commonwealth defendants ensure that L.P. begin to receive all of the staffing, services, and habilitation set forth in his IHP at his present ICF/MR residence on or before July 1, 1983. The Commonwealth may accomplish this in several ways. It may remit to Shiloh the funds Shiloh has required to fulfill the terms of L.P.'s IHP. Or the state may

arrange for another private care provider to furnish the IHP-mandated services to L.P. Or the state may itself furnish a community residence and services to L.P.

This Court is not concerned with the source of funds, the entity providing services, or the relative cost of services. Those are concerns of the defendants to this litigation. This Court's only concern is that the retarded class members receive their constitutional and statutory rights as enunciated in the decisions of this Court and the Third Circuit. The rights of a retarded person to enjoy his or her constitutional and statutory rights to receive adequate habilitation in society are not to be denied on the basis of a contract dispute between the Commonwealth and a provider. If the Commonwealth feels that it can obtain a less expensive provider than Shiloh or can itself provide L.P. with the required services at a lower cost than Shiloh, this Court's Orders will not be violated. L.P. must receive his IHP-mandated services. Anything less than that is contempt of this Court's Orders.

At this point, the Court wishes to stress that the dispute between the Commonwealth, Shiloh and Prospectus has involved only budgetary arguments. No one involved in the IHP planning process for L.P., the hearing before the Hearing Master, or the hearing before this Court on April 13, 1983, has questioned the quality of services provided to L.P. by Shiloh and Prospectus. The Hearing Master found the performance of Shiloh and Prospectus frontline staff to be exemplary (*see* Hearing Master's Report of November 1, 1982 at 7) and his findings are amply supported by the record.

As heretofore noted, L.P.'s parents initially objected to his placement in the community and requested a hearing before the Hearing Master seeking to obtain the Court's disapproval of the transfer. However, when L.P. was sent to the Shiloh community living facility for a pre-placement visit, they observed his rapid habilitation progress as contrasted to his stagnation at Pennhurst and became convinced that community habilitation was a better way

for their son. Then, however, the Commonwealth's actions in disregard of L.P.'s IHP and this Court's Orders threatened his hopes for a brighter future. As the Hearing Master noted

[E]ven as they surveyed the wreckage of Shiloh's ICF/MR program, Mr. and Mrs. A.P. were unwilling to abandon their vision of how things could be. Asked their preference among all the possible placements now open to L.P., they flatly rejected a return to Pennhurst—because of the excellence and commitment of the Shiloh and Prospectus staff, and because of the dramatic improvement they had seen in their son's behavior and abilities. The honesty and courage of these troubled, caring parents stands in stark and shining contrast to the cynical and petty bureaucratic maneuverings that now threaten L.P.'s future in the community.

(Report of November 1, 1982 at 7). An appropriate Order will be accordingly entered.